# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

VERONIQUE A. LONGMIRE,
and LAURA BARBER, on behalf
of themselves and others similarly
situated,

      Plaintiffs,

vs.                                                  CIVIL NO. 03-1404 WPJ/RLP

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, d/b/a Los Alamos National
Laboratory,

      Defendant,

                                                      **Consolidated with Civil No. 04-0112**[1]

YOLANDA GARCIA, et al.,

vs.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, AND G. Peter Nanos,
in his individual and official capacities,

      Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR PARTIAL DISMISSAL**

THIS MATTER comes before the Court upon a Motion for Partial Dismissal filed on

April 28, 2004 **(Doc. 30)** by Defendant Regents of the University of California, (hereinafter

"LANL")[2] and G. Peter Nanos ("Nanos"). Having considered the parties' briefs and the

---

[1] The cases were consolidated by stipulated order on March 11, 2004 (Civil No. 04-0112, Doc. 8). Civil No. 04-0112 was originally filed in the First Judicial District Court of the State of New Mexico, and removed to federal court on February 3, 2004.

[2] The Regents of the University of California manages Los Alamos National Laboratory ("LANL") under a contract with the U.S. Department of Energy.

applicable law, I find that Defendants' motion should be granted in part for the reasons set out below.

## Background

This consolidated case alleges that LANL discriminates against certain groups of its employees -- females and Hispanics.  The Longmire Plaintiffs are female employees who claim that they are paid less than their male counterparts who perform the same or substantially the same work.  They also claim that they are denied promotions and educational opportunities because they are female.   The Longmire complaint alleges violations of the Equal Pay Act, 29 U.S.C. §206(d) ("EPA") and a breach of employment contract.   These Plaintiffs bring this lawsuit on behalf of themselves and other similarly situated female employees of LANL, and seek certification of this case as a class action.

For the other group of Plaintiffs, the Garcia Plaintiffs, the claims of discrimination are based on ethnic background, in that Hispanic employees are treated less favorably than non-Hispanic employees with respect to compensation, promotions, and other tangible employment practices.  In addition to alleging violations of the EPA, they also assert claims under Title VII, 42 U.S.C. §§ 20000 *et seq.*, 42 U.S.C. § § 1981 and 1983, the New Mexico Human Rights Act ("NMHRA"), NMSA 1978 , §§ 28-1-1 et seq., and breach of employment contracts involving these employees. The Garcia Plaintiffs also seek certification of this case as a class action lawsuit.

Defendants contend that any disparities in salaries are the result of legitimate factors such as seniority, a merit system, market forces, employment history and/or the quality or quantity of work production by the employee.  They also contend that Plaintiffs have been afforded equal

opportunities for promotions and education.

## Discussion

Defendants' motion is directed to certain of Yolanda Garcia's claims. Defendants seek dismissal under Fed.R.Civ. P.12(b)(6) of: (1) the claims brought against the Regents and Nanos, in his official capacity, under 42 U.S.C. § 1983; (2) the claims brought against both Defendants under 42 U.S.C. §1981; (3) the claim brought against Nanos under Title VII; and (4) the breach of contract claim brought against Nanos. The issues have since been narrowed, based on Plaintiffs' response brief. Plaintiffs stipulate to the dismissal of the breach of contract claim against Nanos, and to the dismissal of the Title VII claim against Nanos in his individual capacity (but still maintain that a Title VII claim should proceed against Nanos in his official capacity). As to the § 1983 claims, Plaintiffs have clarified that they are bringing those claims against Nanos in his individual capacity for money damages, and against Nanos and the Regents in their official capacities for injunctive relief. Defendants do not now seek dismissal of Plaintiffs' claims to recover damages against Nanos in his individual capacity, and agree that Plaintiffs have stated a claim for injunctive relief against Nanos in his official capacity. However, Defendants still challenge Plaintiffs' request for injunctive relief under § 1983 against the University as a state entity; Plaintiffs' § 1981 claim on the grounds that Plaintiffs' exclusive remedy lies under § 1983; and the Title VII suit against Nanos in his official capacity. I therefore turn to a discussion of the three remaining contested issues.

<u>Legal Standard</u>

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." When addressing a Rule

12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint and view those allegations in the light most favorable to the non-moving party. Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). Reasonable inferences raised in the pleadings must be resolved in favor of the plaintiff, Dill v. City of Edmond, 155 F.3d 1193, 1201 (10th Cir. 1998), but a court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations. Hall v. Belmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

I.      § 1983 claims brought against the Regents

The Eleventh Amendment guarantees that "nonconsenting States may not be sued by private individuals in federal court." Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); see also Alden v. Maine, 527 U.S. 706, 713 (1999) (States' immunity from suit is a "fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution and which they retain today"). A suit against an official sued in his official capacity is the same as a suit against the state. However, official-capacity actions for prospective injunctive relief "are not treated as actions against the State," because an official, when sued for injunctive relief, is considered a "person" under § 1983.[3] Will v. Mich. Dept. of State Police, 491 U.S. 58, 71, n.10 (1989) (citing Kentucky v. Graham, 473 U.S. 159, 167, n.14 (1985) and Ex Parte Young, 209 U.S. 123, 159-160 (1908)).

A.      Whether Eleventh Amendment Applies to Defendant Regents

---

[3] Section 1983 states, in part: "Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (emphasis added).

4

Defendants concede that Plaintiffs have stated a claim under § 1983 against Defendant Nanos for prospective injunctive relief, under Will v. Michigan Dept. of State Police, but contend that such claims brought against the Regents are barred by the Eleventh Amendment.  Plaintiffs do not dispute that Defendants cannot be sued as a state entity, but maintain that because they are suing the "Regents" (as well as Nanos) in their official capacities, they have stated valid claims under § 1983 against all Defendants.  Thus, the query becomes whether Will applies to Plaintiffs' claims against the Regents.  Taking Plaintiffs' arguments at face value, "Regents" could refer to a collective group of individuals, who are sued in their official capacities.  However, that is not the reality, either according to the pleadings previously submitted by Plaintiffs or on provisions of the state law that created the "Regents of University of California."  As stated in the Amended Complaints in both cases now consolidated, Plaintiffs understood Defendants Regents to be an entity, not a group of individuals:

> Defendants Regents of the University of California ("University") was at all times relevant to this action a legal entity organized and existing under the laws of the State of California, doing business in the State of New Mexico.

Amended Complaint, ¶ 7 (Doc. 29).  Further, the use of the word "Regents" and the phrase "Regents of the University of California" (as stated in the caption of the complaint) clearly refers to an entity as a matter of state law:

> The University of California shall constitute a public trust, to be administered by the existing corporation known as "The Regents of the University of California. . . ."

Cal.Const. art. 9, § 9(a); see also, Duke v. Grady Municipal Schools et al., 127 F.3d 972, 975 (10th Cir. 1997) (whether local entity is arm of the state under Eleventh Amendment is question of federal law, although that federal question can be answered only after considering provisions of

5

state law that define agency's character).  Thus, because Plaintiffs' assertions against Defendant Regents of the University of California are pled against a state entity as opposed to individuals in their official capacities, the Eleventh Amendment would apply to preclude Plaintiffs' § 1983 claims.  Cmp., e.g., Chaffin v. Kansas State Fair Bd., et al., 348 F.3d 850, 866 (10th Cir. 2003) (plaintiff allowed to seek injunctive relief where State of Kansas was dismissed as party, and remaining defendants in amended complaint were state officers sued in their official capacities, which included the General Manager of the Kansas State Fair and Members of the Kansas State Fair Board).

B.      Whether Defendants Waived Eleventh Amendment Defense

The question which necessarily follows is whether, as Plaintiffs contend, Defendants have waived the Eleventh Amendment Defense by removing the case to federal court. Defendants have opted not to address this issue at all in their reply.

States are generally immune from suit brought by private individuals, but states can waive the defense of immunity by either consenting to suit or where Congress has unequivocally abrogated a state's Eleventh Amendment immunity. Alden v. Maine, 527 U.S. 706, 755 (1999). Also, as mentioned previously, under the doctrine announced in Ex parte Young, 209 U.S. 123 (1908), an individual seeking only prospective injunctive relief for ongoing violations of federal law may bring suit against state officials in federal courts.  Chaffin v. Kansas State Fair Bd. 348 F.3d 850, 865-66 (10th Cir. 2003) (citing Alden, 527 U.S. at 757).  The test for determining a waiver of immunity is strict and  "there must be an 'unequivocal intent' to waive the immunity." Sutton v. Utah State Sch. for the Deaf and Blind, 173 F.3d 1226, 1234 (10th Cir. 1999) (Eleventh Amendment bar may be waived by state's consent to suit) (quoting Atascadero State Hosp. v.

Scanlon, 473 U.S. 234, 241 (1985)).

The question of whether removal by a state defendant constitutes a waiver of immunity has been answered in the affirmative by a series of comparatively recent case law from both the Supreme Court and the Tenth Circuit. In Wisconsin Dept of Corr. v. Schacht, 524 U.S. 381, 392-93 (1998), the Supreme Court held that the presence of an Eleventh Amendment claim did not preclude a state defendant from removing to federal court, although it did mean that the court could hear only those claims not barred by the Eleventh Amendment. The Tenth Circuit first addressed the sovereign immunity/removal question in Gallagher v. Continental Ins. Co., 502 F.2d 827 (10th Cir. 1974). The Court determined that the State had waived its defense Eleventh Amendment immunity in federal court, noting that the State had made a general appearance, joined in the removal petition, resisted plaintiff's remand motion and moved to dismiss for failure to state a claim. Id, 502 F.2d at 830.[4] The Tenth Circuit faced the sovereign immunity issue in several other cases following the Supreme Court's decision in Schacht.[5]

Finally, in Estes v. Wyoming Dep't of Transportation, 302 F.3d 1200 (10th Cir. 2002), the Tenth Circuit closed any gaps in the jurisdictional black hole of Eleventh Amendment immunity as it relates to removal by a State defendant. In Estes, the Tenth Circuit found the act of removal to be sufficiently voluntary, and sufficiently indicative of a State's intent to waive its immunity,

---

[4] The case was ultimately dismissed for lack of standing.

[5] See, Sutton v. Utah State School for the Deaf and Blind, 173 F.3d 1226, 1233-34 (10th Cir. 1999); McLaughlin v. Bd. of Trustees of State Collegees of Colorado, 215 F.3d 1168, 1171 (10th Cir. 2000); Lapides v. Bd. of Regents of the Univ. System of Georgia, et al., 535 U.S. 613, 624 (2002).

7

regardless of its motive for removal.[6] The only basis for distinguishing the above cases from the case before me has already been addressed in Estes. In that case, the State defendant argued that a State must "both remove *and litigate the merits of a case* in federal court before a waiver of sovereign immunity will be inferred." Estes, 302 F.3d at 1205 (emphasis supplied in original). However, the Tenth Circuit observed that "nothing in these three cases limits their holdings to cases litigated on the merits following removal." Id. at 1205. Accordingly, based on the foregoing reasons, I find that Defendants have waived their defense of Eleventh Amendment immunity.

C.  Section 1983 Claim Against State

Having won the battle on the immunity issue, Plaintiffs have lost the war on their § 1983 claim against the state. It should be obvious, from the final results in Lapides and McLaughlin, that a § 1983 claim cannot be asserted against a State defendant. See, Will v. Michigan, 491 U.S. at 66. This has no effect on the viability of the claim as asserted against Defendant Nanos in his official capacity for prospective injunctive relief, as previously explained.

**II.  § 1981 claims brought against both Defendants**

Defendants argue next that Plaintiffs' § 1981 claim cannot proceed as long as they are pursuing claims brought under § 1983, because § 1983 is the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the alleged discrimination occurs at the hands of state entities or officials. This question has met with some disagreement among the

---

[6] The Tenth Circuit applied Alabama v. Garrett, 531 U.S. 356 (2001), decided after the district court's decision in Estes, and reversed the district court's decision that Congress validly abrogated the States' sovereign immunity in the ADA Title I claim. The court then went on to consider whether defendant's removal to federal court waived the defense. Estes, 302 F.3d at 1203.

8

circuits. The closest the Tenth Circuit has come to addressing this question is a footnote in a case which affirmed, but did not examine, the lower court's dismissal of plaintiff's § 1981 claim on the basis that it was precluded by the plaintiff's § 1983 claim. See, Burns v. Bd. of county Comm'rs, 330 F.3d 1275 (10th Cir. 2003). In that case, the Tenth Circuit found that plaintiff failed to show that his constitutional rights were violated under either § 1981 or § 1983, thus rendering the issue of whether he had a direct cause of action under § 1981 "immaterial." Id at 1228, n.10. In the instant case, without looking at the merits, Plaintiffs have alleged both § 1983 and § 1981 claims against Defendants, who are state actors,[7] and the Court must determine whether both claims will be allowed to proceed.

A.     Relevant Case Law and Statute

In 1976, the Supreme Court decided Runyon v. McCrary, 427 U.S. 160, 174 (1976), which held that § 1981 prohibited discrimination by private as well as public actors, in order to remedy discrimination in private employment contracts. Subsequently, the Supreme Court decided Jett v. Dallas Indep. Sch. Distr., 491 U.S. 701, 733 (1989), which held that § 1983 is the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units. In other words, a plaintiff asserting violations of § 1981 against state entities or state actors was limited to actions brought under § 1983.

Before the 1991 amendments to the Civil Rights Act were passed, 42 U.S.C. § 1981 read:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and

---

[7] See, discussion above pertaining to Eleventh Amendment. Plaintiffs do not dispute that Defendants are state actors. See also, Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 935 n. 18, (1982) ("[S]tate employment is generally sufficient to render the defendant a state actor").

> property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In 1991, the above section was designated as subsection (a), and the following subsections were added:

> (b) "Make and enforce contracts" defined:  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment: The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State Law.

Pub.L. 102-166, Title I, § 101 (1991), 105 Stat. 1071, as amended, 42 U.S.C. § 1981(b)-(c).  It is subsection (c) which has caused the discord among the courts -- the central question being whether the 1991 amendments created a separate cause of action against state governmental entities under § 1981, or instead merely codified the ruling in Runyon v. McCrary, 427 U.S. 160 (1976).  Under the former theory, Jett (which precluded § 1981 claims against public officials where § 1983 claims were also asserted) would implicitly be overruled, and Plaintiffs here could proceed with their § 1981 claims in addition to any claims brought under § 1983.  But, if the 1991 amendment in subsection (c) simply codified Runyon in confirming that § 1981 prohibits discrimination by private as well as governmental actors, Jett remains unscathed, and would require dismissal of Plaintiffs' § 1981 claims.

B.      How Other Courts Have Decided

The Fourth, Fifth and Eleventh Circuits have concluded that the 1991 amendments had no effect on the Supreme Court's holding in Jett.  See, Dennis v. County of Fairfax, 55 F.3d 151, 156 n. 1 (4th Cir.1995); Oden v. Oktibbeha County, Miss., 246 F.3d 458, 462-64 (5th Cir. 2001);

10

Butts v. County of Volusia, 222 F.3d 891, 894 (11th Cir.2000); see also, Felton v. Polles 315 F.3d 470, 481-82 (5th Cir. 2002) (§ 1983 constituted plaintiff's exclusive remedy for the claimed § 1981 violation by a state actor) (citing Oden).  These courts have discussed the issue of the 1991 amendments' effect on Jett at considerable length.  See also, Johnson v. City of Fort Lauderdale, 903 F.Supp. 1520, 1522- 23 (S.D.Fla.1995).  The Second Circuit has noted the ambiguity of § 1981(c), but found it unnecessary to resolve.  However, an extensive analysis by the district court in the Southern District of New York, holding that subsection (c) "did not purport to overrule Jett's holding with respect to municipal liability but only to codify [Runyon]," is mentioned frequently in court decisions that have found likewise.  See, Philippeaux v. North Central Bronx Hosp., 871 F.Supp. 640, 655 (S.D.N.Y.1994).  Whether § 1981 claims are available against state actors is still an open question in the Third Circuit.  See, Cardenas v. Massey, 269 F.3d 251, 269 (3rd Cir. 2001) ("[f]ederal courts have disagreed whether § 1981(c) abrogates Jett by creating an implied independent cause of action") (citations omitted).

Despite the fact that the Tenth Circuit has not had to address the issue, two district courts in Kansas have, ending up siding with the Fourth, Fifth and Eleventh Circuits.  See, Sims v. Unified Government of Wyandotte County/Kansas City, Kan.,120 F.Supp.2d 938 (D.Kan.,2000) (adopting the view that Jett's holding, to the effect that § 1983 provides the exclusive remedy for pursuing damages against a state actor for claims arising under § 1981, remains valid).  Also, in Stewart v. Board of Comm'rs for Shawnee County, Kansas, 216 F.R.D. 662 (D.Kan.,2003), the court granted dismissal of plaintiff's § 1981 claims on the grounds that § 1983 provides the exclusive remedy for claims against a county, citing Burns v. Board of County Commissioners.  The court in Stewart noted that the Tenth Circuit had affirmed the Burns decision without

deciding the issue and while recognizing a split in the circuits. The court went further, adopting what it considered to be the more persuasive line of reasoning followed by the district courts in both Burns and Sims, which found that Jett's holding, to the effect that § 1983 provides the exclusive remedy for pursuing damages against a state actor for claims arising under § 1981, remained valid after the 1991 amendments. 216 F.R.D. at 664.

Courts that have ended up deciding that the 1991 amendments did not impliedly create a separate cause of action against public officials have decided that way by relying on the lack of legislative history reflecting an intention to overrule Jett. These courts did not interpret the allusion to persons acting "under color of State law" in the amendment as implying Congressional intent to create a remedy in addition to § 1983, and were not willing to deviate from the Supreme Court ruling in Jett in the absence of clear legislative intent. As the court in Sims noted, "it is not logical to conclude that Congress overturned Jett by implication, while expressly codifying the holding of Runyon (citations omitted); see, Oden v. Oktibbeha County, 246 F.3d at 463 ("Subsection (c) does not expressly create a remedial cause of action against local government entities, and we are not persuaded that such a remedy should be implied," and noting that by codifying Runyon in subsection (c), "Congress confirmed that § 1981 implies a cause of action against private actors"). The Eleventh Circuit stated:

> Nothing in the 1991 amendment to § 1981 evinces Congress' desire to alter the Supreme Court's conclusion in Jett. The express language of subsection (c) states that § 1981 protects against racial discrimination by private and state actors. Put another way, § 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation.

Butts v. County of Volusia, 222 F.3d at 894. The Fourth Circuit referred to Philippeau in concluding that Jett still controls actions alleging § 1981 actions against governmental entities:

12

> We think the correct reading of the amendment is found in Philippeaux v. North Central Bronx Hosp., 871 F.Supp. 640 (S.D.N.Y.1994), which recognizes that subsection (c) did not purport to overrule Jett 's holding with respect to municipal liability but only to codify Runyon v. McCrary, . . . .

Dennis v. County of Fairfax, 55 F.3d at 156, n. 1 & accompanying text.

The district court in Johnson reasoned that the amendments to § 1981 were consistent with the Supreme Court's holding in Jett:

> Jett did not, as several cases suggest, hold that § 1981 provided no protection for actions taken under color of state law. On the contrary, until the Supreme Court's ruling in Runyon there was some doubt as to whether § 1981 protected against anything else. After an exhaustive review of the legislative history of § 1981 and its precursors, the Court in Jett concluded that § 1981 prohibits discrimination by individuals acting under color of state law, but does not create a civil cause of action against them. Instead, § 1983 provides the means through which a party aggrieved under § 1981 must seek relief. Moreover, the Court addressed the apparent inconsistency of its ruling with its earlier holding that § 1981 created a cause of action for individuals discriminated against by private parties.

At 1523. While much of the analysis spent on the issue by other courts resorted to legislative intent and history, the Johnson court found it unnecessary to turn to the legislative history because it found that the amendments to § 1981 were "facially clear and unambiguous." Nevertheless, the court still found that the legislative history would not support a finding that Jett was overruled by the amendments. For one thing, Jett was not cited anywhere in the legislative history dealing with § 1981(c). For another, the relevant legislative history merely noted in passing that "the new subsection 'also confirms section 1981's coverage of both public and private sector employment[,]'" and thus subsection (c) "was merely intended to codify existing case law." 903 F.Supp. at 1522, n.1 (citing House Report No. 102-40(I)) (other citations omitted). Following its own review of the amendments to § 1981 and the legislative history, the court in Johnson found "no indication that subsection (c) creates a new civil cause of action," and dismissed plaintiff's §

13

1981 claims against the city, with leave to amend to add claims brought under § 1983. 903 F.Supp. at 1523.[8]

The only circuit court to have addressed the issue and concluded to the contrary is the Ninth Circuit, which held that the 1991 amendments implicitly created a cause of action against local government entities, thereby overruling Jett's requirement that claimants sue state actors under 42 U.S.C. § 1983 for violations of 42 U.S.C. § 1981. See, Federation of African American Contractors, et al. v. Oakland, 96 F.3d 1204 (9th Cir.1996). The Ninth Circuit reconciled the lack of explicit legislative history reflecting an intention to overrule Jett with its conclusion that subsection (c) permitted direct causes of action against state actors by reasoning that "[t]he failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available." 96 F.3d at 1213.

C.     Conclusion

Not much deliberation is required to decide which line of reasoning is the more persuasive. It makes sense -- both legal and common -- to follow those courts which have left Jett intact, and which have easily harmonized its holding with the 1991 amendments to § 1981 and with its effect on Runyon. I believe this has been accomplished in the analyses conducted by the Fourth, Fifth and Eleventh Circuits, and by the enlightening district court opinions from the Southern District of New York, the Southern District of Florida, and the District of Kansas -- Johnson, Philippeau, Sims and Stewart, respectively.

---

[8] The court did not dismiss plaintiff's § 1981 claims against the individual defendants, since "the reasoning in Jett is inapplicable to actions by private parties." 903 F.Supp. at 1523 (citing Jett, 491 U.S. at 731). The district court opinion in Johnson was superseded on rehearing by Johnson v. City of Fort Lauderdale, 148 F.3d 1228 (11th Cir. 1998), but only with regard to plaintiff's claims against these private individuals.

The reasoning used by these court is also the more appealing because it strains the bounds of legal precedent to impliedly overturn Supreme Court precedent based on an *absence* of legislative history, particularly when a statute's language does not compel such a result. Subsection (c) can easily be construed to recognize a right which prohibits against both public and private discrimination and impairment, while at the same time limiting the appropriate remedy to claims asserted under § 1983 when brought against public officials.[9]  I also agree with the observation made by several courts that those courts which did a "more complete analysis of the 1991 amendment" have held that Congress never intended to overrule Jett by adding subsection (c).  Sims, 120 F.Supp.2d at 953; see also, Johnson, 903 F.Supp. at 1523 (stating that cases which courts that have held that the 1991 amendments overruled Jett do not contain a "detailed or well reasoned inquiry" into the issue, but instead "merely assumed that the addition of subsection (c) to § 1981 altered the prior state of the law"); Dennis, 55 F.3d at 156, text & n.1 (noting that "some district courts have asserted, largely without explanation," that Jett was affected by the Civil Rights Act of 1991, which added subsection (c) to § 1981).[10]

---

[9] For this reason, Plaintiffs' reliance on the test set out in Cort v. Ash, 422 U.S. 66 (1975) for deciding whether a private cause of action is implied by a statute, is in vain.  As Plaintiffs note, the Tenth Circuit has summed up the inquiry into the single question of "whether Congress intended to create a private cause of action." Sonnenfeld v. City and County of Denver, 100 F.3d 744, 747 (10th Cir. 1996).   My previous discussion of other court decisions which have wrestled with the question, and with those courts' discussions pertaining to the legislative history of subsection (c), should make it clear that the answer would be answered in the negative.

[10] One District of New Mexico case has taken the Ninth Circuit's view, finding that "both § 1983 and § 1981 may be utilized to redress discriminatory state action." La Compania Ocho, Inc. v. U.S. Forest Service, 874 F.Supp. 1242, 1251 (D.N.M.,1995) (Burciaga, J.)  Other than citing to an earlier District of Kansas decision, Gallardo v. Board of County Comm'rs, 857 F.Supp. 783, 786 (D.Kan.1994), the court's analysis in La Compania was short, simply stating that in adding subsection (c) to § 1981, "Congress' intent was to overrule [Jett]. . . ."

It is worth mentioning that even if subsection (c) allowed a direct cause of action against state officials, other legal barriers to municipal liability could preclude § 1981 suits. Even the Ninth Circuit acknowledged that it is "highly implausible that congress silently intended to impose *respondeat superior* liability on state actors for the violation of § 1981 rights. . . ." Federation of African American Contractors, 96 F.3d at 1215; see also Gallardo v. Board of County Commissioners, 857 F.Supp. 783, 786-87 (D.Kan.1994) (finding that § 1981(c) overrules Jett in so far as Jett made § 1983 the exclusive means of reaching municipalities, but then determining that Congress did not abandon the rules of municipal liability under § 1983 when it added the "under color of State law" language to § 1981), cited in Philippeaux, 871 F.Supp. at 654 n. 7; Butts, 222 F.3d at 894 n.4 (agreeing that limitation on *respondeat superior* liability would exist if § 1981 contained a cause of action) (citing Federation, 96 F.3d at 1214-15); Dennis, 55 F.3d at 156, n.1 (§ 1983 requirement that plaintiffs show an "official policy or custom of discrimination also controls in § 1981 actions against state entities") (citing Jett, 491 U.S. at 733); cmp., Tafoya v. Bobroff, 865 F.Supp. 742, 752 (D.N.M. 1994) (Burciaga, J) (§ 1981 claims could not proceed because school district employees when sued in their official capacities were not "persons" for the purposes of the Civil Rights Act of 1991, including suits under § 1981).

Having found the more persuasive rationale to be that recited in the opinions of the Fourth, Fifth, and Eleventh Circuits, I likewise conclude that the 1991 amendments to § 1981 did not overrule Jett's requirement that when suit is brought against a state actor, § 1983 is the "exclusive federal remedy for violation of the rights guaranteed in § 1981." Accordingly, since the Defendants in this case are either individuals acting "under color of State law," or are government entities, Plaintiffs' § 1981 claims are dismissed from this action.

**III.     Title VII claim against Nanos (official capacity)**

Finally, Defendants contend that Plaintiffs' Title VII claim against Defendant Nanos should be dismissed because Plaintiffs cannot maintain a lawsuit under Title VII against *both* the University and Nanos in his official capacity.

The hallmark of a Title VII claim is that it applies only to employers. See Lankford v. City of Hobart, 27 F.3d 477 (10th Cir. 1994) (citing Sauers v. Salt Lake County, 1 F.3d 1122, 1127 (10th Cir. 1993)).  Thus, Plaintiffs were wise to concede that their Title VII claim should be dismissed against Defendant Nanos in his individual capacity only.  Response at 14.  See, Haynes et al v. Williams et al, 88 F.3d 898, 901 (10th Cir. 1996) (noting legislative history of statute did not envision individual liability); Peterson v. Brownlee, 314 F.Supp.2d 1150, 1155 n.4 (D.Kan. 2004) (noting that, although not expressly stated, plaintiff must have intended to name defendant in his official capacity since personal capacity suits against individual supervisors are inappropriate under Title VII and since official capacity suits represent only another way of pleading an action against an entity of which an officer is an agent) (citing Haynes, 88 F.3d at 899 and Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)).[11]

Plaintiffs are correct in their position, but only up to a point.  They correctly argue that a Title VII claim can proceed against a supervisory employee when named in his *official* capacity. Haynes states:

> Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act. We think

---

[11] Tenth Circuit has made it clear it would continue to follow Sauers, which had become the majority view regarding the "limited role of individual supervisors in Title VII's remedial scheme." Haynes 88 F.3d at 899.

17

>the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly. Therefore, because the suit against [plaintiff's supervisor] could proceed only in his official capacity, it operated as a suit against [plaintiff's employer] itself . . . .

Haynes, 88 F.3d at 899, citing Sauers, 1 F.3d 1122.  Thus, Plaintiffs are indeed free to assert their Title VII claims against Nanos in his official capacity as a way of asserting the claims against their employer.  However, their ability to maintain a Title VII claim against *both* Defendant Regents *and* Nanos in his official capacity is a different question.

Suing Nanos in his official capacity does not render him liable; it is simply one way of filing suit against Plaintiffs' employer.   However, my reading of Tenth Circuit precedent under Haynes is that Plaintiffs cannot have it both ways by suing both the employer and the named supervisory employee as a means of asserting the claim against the employer.  See, Haynes, 88 F.3d at 899 ("We think the proper method for a plaintiff to recover under Title VII is by suing the employer, *either* by naming the supervisory employees as agents of the employer *or* by naming the employer directly) (emphasis added); cmp., Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1449 (10th Cir. 1997) (the Sauers definition of "agent" should be used only in deciding whether a suit against an individual employee can operate as a suit against the employer itself), judgment vacated on other grds. by, Eddy Potash, Inc. v. Harrison, 524 U.S. 947 (1998).

Plaintiffs' proposal is not only legally incorrect under Tenth Circuit precedent, but also is redundant and confusing, and possibly opens the door to double recovery.  See, Indest v. Freeman Decorating, Inc., 164 F.3d 258, 262 (5th Cir. 1999) (recognizing that because Title VII is actually a suit against a corporation or employer, and finding that it would be redundant for plaintiff to sue both employer and supervisor in his official capacity "because effectively the corporation could be

held liable twice for the same act") (citations omitted).

I therefore agree with Defendants that Plaintiffs' Title VII against Defendant Nanos should be dismissed.

## Conclusion

(1) *§ 1983 claims against Defendant Regents*: Defendant Regents has waived the defense of Eleventh Amendment immunity by joining in removal and emoving the action to federal court. However, Plaintiffs' § 1983 claim against Defendant Regents will be dismissed on the basis that Defendant is a state entity which is not considered a "person" for purposes of § 1983;

(2) *Plaintiffs' § 1981 claims against Defendants*:  The 1991 amendments to the Civil Rights Act, which added subsection (c) to § 1981, did not create a direct cause of action against public officials.  Further, the amendments did not overrule the Supreme Court's decision in Jett v. Dallas Indep. Sch. Distr., 491 U.S. 701, 733 (1989), which held that Congress intended § 1983 to be the sole remedy for discrimination by persons acting under color of state law.  Therefore, Plaintiffs' § 1981 claims, which are asserted against Defendants who are either individuals acting "under color of State law," or are governmental entities, must be dismissed from this action.

(3) *Plaintiffs' Title VII claim against Defendant Nanos*: This claim is also dismissed. While asserting a Title VII against a supervisory employee in his individual capacity is a way of asserting the claim against the employer, Plaintiffs cannot proceed against *both* the employer and the supervisor.

**THEREFORE,**

**IT IS ORDERED** that the Motion for Partial Dismissal **(Doc. 30)** is GRANTED IN

PART AND DENIED IN PART in that (i) Plaintiffs' § 1983 claims against Defendant Regents;[12] (ii) Plaintiffs' § 1981 claims and (iii) Plaintiffs' Title VII claims against Defendant Nanos are all DISMISSED WITH PREJUDICE.

_____
UNITED STATES DISTRICT JUDGE

---

[12] Defendants' motion with respect to the § 1983 claims is denied in the sense that Defendants are denied relief on the basis of Eleventh Amendment immunity, since I found the defense to be waived by Defendants' removal to federal court. However, the result is that Defendants prevail on this issue, since the § 1983 claims are dismissed on other grounds.