# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LAURA BARBER, on behalf
of themselves and others similarly
situated,

     Plaintiffs,

vs.                                            CIVIL NO. 03-1404 WPJ/RLP

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, d/b/a Los Alamos National
Laboratory,

     Defendant,

*Consolidated with*                                CIVIL NO. 04-0112 WPJ/RLP

YOLANDA GARCIA, et al.,

     Plaintiffs,

vs.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, and G. Peter Nanos,
in his individual and official capacities,

     Defendants,

*Consolidated with*                                CIVIL NO. 05-1082 WPJ/RLP

VERONIQUE A. LONGMIRE ,

     Plaintiff pro se,

vs.

REGENTS OF THE UNIVERSITY
OF CALIFORNIA, d/b/a LOS ALAMOS
NATIONAL LABORATORY,

     Defendant.

*Consolidated with*                                    CIVIL NO. 07-0673 WPJ/RLP

VERONIQUE A. LONGMIRE,

      Plaintiff pro se,

vs.

REGENTS OF THE UNIVERSITY OF CALIFORNIA
d/b/a LOS ALAMOS NATIONAL LABORATORY, and
LOS ALAMOS NATIONAL SECURITY, LLC
d/b/a LOS ALAMOS NATIONAL LABORATORY,

      Defendants,

*Consolidated with*                                    CIVIL NO. 07–0753 WPJ/RLP

VERONIQUE A. LONGMIRE,

      Plaintiff pro se,

vs.

REGENTS OF THE UNIVERSITY OF CALIFORNIA
d/b/a LOS ALAMOS NATIONAL LABORATORY, and
LOS ALAMOS NATIONAL SECURITY, LLC
d/b/a LOS ALAMOS NATIONAL LABORATORY,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING SUMMARY JUDGMENT

      THIS MATTER comes before the Court on the three Motions for Summary Judgment filed

on July 14, 2008, by the Regents of the University of California ["the Regents"] and Los Alamos

National Security, LLC ["LANS"], both doing business as Los Alamos National Laboratory

["LANL"].  *See* Docs. 332, 334 & 336.  Having considered the parties' briefs, the summary-

judgment record, and the applicable law, I conclude that the motions should be granted and that all

of Plaintiff Veronique Longmire's claims should be dismissed with prejudice against all Defendants.

**Procedural Background**

Longmire, a female African American who is over the age of forty, originally sued the Regents in a class action for violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and for breach of her employment contract.  *See* CIV-03-1404 WPJ/RLP, Compl. (Doc. 1).  In October 2005, Longmire sued the Regents for retaliating against her for having filed the EPA complaint, citing violation of the First Amendment of the United States Constitution, the EPA, Title VII, and the New Mexico Human Rights Act.  *See* CIV-05-1082, Compl. at 1 (Doc. 1).  She later opted out of a settlement of the class-action EPA suit and, in July 2007, filed a second Complaint for breach of contract and violation of the EPA on the basis of her sex "to include LANS as a Defendant in her EPA claims, and to add to and update the EPA claims that were filed in 2003 in CIV-03-1404."  CIV-07-0673, Am. Compl. at ¶¶ 6, 23  (Doc. 5).   In August 2007, Longmire filed an additional Complaint against the Regents and LANS for violation of the Age Discrimination in Employment Act ("ADEA"), alleging the same basic facts as her other Complaints.  *See* CIV-07-753, Doc. 1.  And in November 2007, she amended her Complaint for retaliation to include a claim for discrimination on the basis of race in violation of Title VII, to allege another claim for breach of contract, and to add LANS as a defendant on these claims.   *See* CIV-03-1404, Doc. 286 at 1-2.  I consolidated all of these cases in September 2007, *see id.*, Doc. 250; the parties have engaged in extensive discovery; and discovery is completed.  Unless otherwise noted, all further citations to documents in the record are to documents filed in CIV-03-1404.

In November 2007 I granted a partial summary judgment in favor of the Regents on Longmire's claims for retaliation because Longmire had "failed to meet her burden of showing a disputed issue of material fact with regard to retaliation on the part of the Regents."  Doc. 287 at 8.  In February 2008 I dismissed Longmire's ADEA claims against the Regents on the basis of

Eleventh-Amendment immunity, but allowed her to amend her complaint to add as a defendant any other non-immune employer-entity that could be potentially liable under the ADEA.  *See* Doc. 301 at 1-2.  Longmire filed a second-amended complaint in the ADEA case in June 2008, naming LANL and the Department of Energy as additional defendants.  *See* Doc. 328.  Longmire is currently proceeding *pro se*, thus I have liberally construed her filings.

### Legal Standards

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party makes a proper summary-judgment challenge by meeting its "initial burden to show that there is an absence of evidence to support the nonmoving party's case," *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted), the "opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."  FED. R. CIV. P. 56(e)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings.  To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Bones v.*

*Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citation omitted).  Nor may a party "rest on ignorance of facts . . . or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  In ruling on a motion for summary judgment, a Court does not weigh the evidence or make credibility determinations, *see Anderson*, 477 U.S. at 249, but determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *id.* at 251-52.  And in making this determination, the Court must construe all the facts in the record, as well as the reasonable inferences that can be drawn from those facts, in a light most favorable to the non-moving party. *See Worrell v. Henry*, 219 F.3d 1197, 1204 (10th Cir. 2000).

### Relevant undisputed facts

The following facts are either undisputed or interpreted in a light most favorable to Longmire:

1.  Longmire was employed at LANL, a national scientific research laboratory, from 1998 until 2007.  The Regents initially operated LANL for the DOE during this time period, then LANS assumed its operation on June 1, 2006

2.  Longmire resigned from her employment on January 3, 2007.  She had received merit or other types of pay increases that resulted in a $29,600 increase in her salary between 1998 and 2005 and her salary and benefits had never been reduced.  *See* Doc. 353, Ex. 75; Doc. 333, Ex. B at 2.

3.  LANL has, among others, two pay series, or pay categories, of employees: Specialized Staff Members ("SSMs"), who do not have technical degrees in science or engineering, and Technical Staff Members ("TSMs"), who either have technical degrees or have demonstrated technical competency, **and** who actually perform technical skills and research or other work using

technical or scientific skills.  *See* Doc. 337, Ex. A at 14-15.  SSM-series salaries have a formal "salary range" for each level that is based on "the average salary paid to other employees to fully qualified individuals in positions with duties and responsibilities comparable to those of Laboratory employees."  Doc. 354, Ex. 7.  The TSM-series salaries have no formal pay structure, and salaries are "based on the level of academic degree and number of years of relevant experience."  *Id.*

4.  In LANL's Industrial Business Development ("IBD") Division, reorganized in 2004 as the Technology Transfer Division ("TTD"), employees work with scientists, inventors, and entrepreneurs to develop and market new commercial uses for scientific technology developed at LANL.

5.  TSMs who worked as executives in the IBD to develop and market technology were originally informally called "Technology Commercialization Executives" ("TCEs").  TCE positions required technical degrees.  LANL did not require technical degrees for Business Development Executives ("BDEs") in the IBD/TTD who did some of the same tasks as TCEs.  LANL later designated all employees who worked in this position as BDEs on its website.  The terms TCE and BDE, however, are not official job titles.  *See, e.g.*, Doc. 354, Ex. 33 at 1 (showing Doruk Aytulu, who started out doing BDE work as an SSM-3 as a "Technology Transfer Specialist 4" but whose job title changed to "Staff Member" when he was reclassified as a TSM).

6.  LANL management states that it generally hired individuals with technical degrees and competencies to do business-development work in the IBD division because it believes that "a technical background is a great improver of efficiency [and] it helps in dealing with the research staff and in marketing technologies."  Doc. 352, Ex. 66 at 1.  For example, TSMs "would review patents and spend significantly less time with the lab researcher [than SSMs] . . . [and] required less lab researcher time when dealing with companies to explain the technology."  *Id.*  TSMs could also

be given more complex technical assignments and worked more independently because of their specialized educations.

7.   Longmire, who has an undergraduate degree in International Relations and a Masters Degree in Business Administration, but no technical or scientific degree, *see* Doc. 354, Ex. 1, was classified as a SSM throughout her employment at LANL "because [she] did not have a technical degree."  Doc. 353, Ex. 90 at 3.  She was initially hired in 1998 to work in LANL's Affirmative Action Office ["AAO"] at a salary of $60,000/year, but she was transferred to its IBD division in March 2001.  *See* Doc. 333, Ex. B at 2.

8.   Longmire was informed at that time that her move from the AAO to the IBD would be a lateral transfer but that she would "lose [her] Team Leader [job] title."  Doc. 352, Ex. 71; Doc. 338, Ex. A at 3.  In 2001, "Team Leader" designations in official job titles were "not part of the management structure."  Doc. 354, Ex. 31.  Longmire unknowingly was instead given a "Project Leader" official job-title designation in March 2001, but she did not have any supervisory responsibilities over other employees in her new IBD position.  *See* Doc. 354, Ex. 33 at 3; Doc. 352, Ex. 72.  Longmire never actually "supervised a team" or other employees during her previous AAO "Team Leader" position; she never lead a team as a "Project Leader" in any position at LANL, and the terms "Team Leader" and "Project Leader" were only official job titles in her situation.  *See* Doc. 333, Ex. B at 16; Doc. 353, Ex. 90 at 3; Doc. 337, Ex. E at 3.

9.   In April 2002, Longmire requested changing to a part-time position in the IBD.  *See* Doc. 333, Ex. B at 3.  At that time, her official job titled changed from "Project Leader" to "Tech Transfer Specialist 4."  Doc. 354, Ex. 17.  According to management, the change in job title "more accurately reflect[ed] her duties and responsibilities," Doc. 354, Exs. 32 & 33 at 3 and Longmire does not rebut the veracity of that statement. Until November 2002, Longmire's position in the IBD was

unofficially called a "Market Analyst Specialist" on LANL's website, but on November 18, 2002, her supervisor authorized a change of the unofficial job title to the "informal new BDE title" on the website only, while keeping her "official Lab title" as "defined by the SSM-3 job leveling" the same. Doc. 352, Ex. 54.  In 2003-2004 she was temporarily assigned for six months to the laboratory director's office instead of to IBD.  *See id.*  There, she assisted the Institutional Planning and Evaluation Office with institutional business planning.  *Id.*, Ex. 73.

10.  LANL gave its employees annual performance review scores called Overall Relative Contribution ["ORC"] scores, which were based half on the employee's performance and half on the job's content and perceived benefit to LANL and "how important an employee's job is relative to other jobs."  Doc. 350 at 10; Doc. 335, Ex. F at 3; Doc. 351, Ex. 95 at 4. A total score of 6 "was deemed as meeting requirements." Doc. 335, Ex. F. at 3.  In 2001 and 2002, Longmire received ORC scores of 3.5 for performance and 3.0 for job content.  Doc. 354, Ex. 22 at 1. In 2003, she received a 4.0 for performance and 3.0 for job content.  *Id.*  In 2004 she received a 3.0 for performance and a 3.5 for job content.  *Id.* In 2005, she received a 3.0 for performance and a 2.5 for job content.  *Id.*  And in 2006, she received a 2.8 for performance and a 3.0 for content.  *Id.*  She was awarded a merit increase in pay for each year.  *Id.*  In 2005, two white male TSMs in the TTD received the same ORC scores in both performance and job content as Longmire did.  *See id.* at 1-2. An African-American SSM-2 received a 5.0 total score in 2005, which was the lowest score given in the TTD; and his previous scores had ranged from 6.0-6.5.  *See id.* at 1.  All employees in the division had scores that decreased or increased at times, including team leaders.  *See id.*

11.  When Longmire sought to increase her salary by becoming a TSM, management at LANL informed Longmire in 2003 that LANL would consider reimbursing her for the costs of tuition to take university courses for credit as part of a technical degree program in complexity

science so that she could qualify as a TSM. *See* Doc. 352, Ex. 61. There is no evidence that other employees were treated more favorably or differently in regard to tuition reimbursement. *See* Doc. 333, Ex. B at 18. Longmire decided not to take advantage of that tuition opportunity, and she never obtained a technical degree. *See* Doc. 348 at 17.

12. In March 2004, LANL reorganized its technology commercialization office, Strategic Partnership Office, and IBD division into the TTD.

13. In October 2003, Belinda Padilla had become the acting program manager of the technology commercialization office of the IBD and also became involved in the process of reorganizing the IBD division. *See* Doc. 333, Ex. B at 3, Doc. 354, Ex. 33 at 5. She became the program manager of the Development Office portion of the new TTD in April 2004, when the reorganization of the IBD division was completed. *See* Doc. 354, Ex. 33 at 5.

14. As part of this reorganization, two long-term, TSM, male employees who were both older than Longmire, Dr. Tony Beugelsdijk and Dr. Randy Tremper, and one female TSM employee, Erica Sullivan, who all had been serving as executives in LANL's Strategic Partnership Office, were transferred to TSM-level BDE positions in the new TTD. Their official job titles were "Project Leaders" or "Staff Members," and they transferred in at the same salaries they had been earning in the Strategic Partnership Office. *See* Doc. 349 at 9-10 and n.4, Doc. 354 Ex. 33 at 7. Drs. Beugelsdijk and Tremper both earned more than Longmire when they were transferred to IBD/TTD and were immediately appointed as team leaders. *See* Doc. 349 at 10-11; Doc. 354, Ex. 9. Dr. Beugelsdijk was transferred to another LANL division within the year. *See* Doc. 349 at 12.

15. As a BDE, Longmire had been assigned "to participate in projects that were consistent with her non-technical educational credentials and prior work experiences; these included Internet and literature searches to develop market opportunity assessments, development of educational

programs, and general business consulting." Doc. 333, Ex. E at 4.

16. In "late June 2004" Longmire volunteered to be an unofficial team leader for the three-or-four-member technology management team ["TMT-2"] of which she was a part. Doc. 333, Ex. B at 4. LANL was shut down during part of the approximately six weeks Longmire served as the volunteer, unofficial team leader. *See* Doc. 350 at 8. Laura Barber, a white female SSM-3 had volunteered to be the unofficial team leader before Longmire agreed to take over that position. Doc. 333, Ex. B at 4.

17. In mid-August 2004 Longmire was laterally transferred with no decrease in salary or benefits from TMT-2 to the new Development Office group lead by Belinda Padilla. *Id.* at 4. Eric Canuteson, a white, male, TSM whom Longmire had recommended hiring, and who was younger than forty, was placed on TMT-2 and selected to be its official team leader instead of either Longmire (who no longer was on the team) or Barber (who remained on the team as its licensing executive). *See id.* According to LANL management, Canuteson was selected because "he had a better experience base and likely would provide more technical leadership needed for the team." Doc. 335, Ex. E at 3. Longmire, who was still working part-time, was not selected as the official team leader because "she did not demonstrate the leadership, organization, and multi-tasking skills needed for the position." *Id.*

18. Between 2001 and 2005, the BDE positions that paid more money than Longmire earned were advertised as TSM-level jobs requiring a technical degree in science or engineering; some were for a limited term because of budget constraints. Management at LANL believed that TSMs were "more qualified to do the core work of the [IBD] division." Doc. 333, Ex. B at 7. Longmire either did not apply for these positions or was not considered or interviewed for them because she was not qualified by not having the technical degree or technical skills and because she did not want to

jeopardize her permanent job status by applying for a limited-term position.  *See id.*, Ex. B at 13-14.

19.  Longmire never applied for any position that would have been a promotion for her, nor did she ever apply to be transferred to any other division, office, or position.  *See id.* at 16, 18.

20.  Although a scientific or technical degree is ordinarily required for TSM status, an employee may apply to the Staff Member Review Committee for reclassification as a TSM without such a degree by establishing her technical or scientific accomplishments and demonstrating that the actual work she performs is of a technical or scientific nature.  Doc. 333, Ex. B at 12.

21.  In April 2005 Longmire inquired about being considered for reclassification from an SSM to a TSM and was told that she would have to establish both her technical accomplishments and what special circumstances warranted reclassification for her particular BDE job assignment for the Staff Member Review Committee.  *See* Doc. 337, Ex. A at 10, 17.  The reclassification requirements were no different for Longmire than for any other LANL employee desiring reclassification to a TSM.  *See id.*  Longmire never followed through with applying for reclassification as a TSM.  *See id.*

22.  In August 2005 Longmire requested, and was granted, a change back to working full time.  *See* Doc. 333, Ex. B at 3.  Longmire had received yearly salary increases since 1998 and she received another salary increase of 11.67%, to $89,614, in November 2005 (in comparison to her June 2005 salary) as part of LANL's effort to ensure that salaries more accurately reflected the kinds of work employees were performing.  *See* Doc. 353, Ex. 75; Doc. 352, Ex. 65 at 2-3.  Longmire's increase was not as high as Laura Barber's, a white female SSM-3 who was a licensing executive in TMT-2 of the TTD.  *See* Doc. 333, Ex. B at 8; Doc. 354, Ex. 9 at 1; Doc. 353, Ex. 75

23.  Ten of the TSMs who were BDEs during the time Longmire was also a BDE were older than Longmire.  Doc. 337, Ex. C at 3.

11

24. In May 2006 Longmire "volunteered" to be assigned to work half-time as LANL's lead participant in a new project called the New Mexico Small Business Assistance Program ["NMSBAP"], which was viewed as a "priority and a high visibility assignment for [LANL]" and a "very interesting and very necessary" program. Doc. 353, Ex. 74 at 1-9; Doc. 333, Ex. B at 5. Management perceived Longmire to be the most qualified employee to perform the job; appointing a different employee in the position would leave a hole that could not be filled; the budget crisis at LANL precluded hiring a new employee to fill the position; and they believed it would be a "good career move" for Longmire. *See* Doc. 353, Ex. 74 at 9-10. Longmire was to wind down the few IBD projects she was working on and to hand off her clients to other executives, but she also was permitted to spend 25% of her time, as she requested, to develop her "skill set in licensing, agreements, and business development," by working with Laura Barber in licensing and by selecting a project to be mentored by TSM John Mott. *Id.* When Belinda Padilla, her supervisor, informed Longmire in late August 2006 that the NMSBAP assignment was permanent and would require 75% of her time, Longmire considered it to be a career change that would cause "financial suicide." *Id.* at 2. But her assignment to the NMSBAP did not result in a change in her position, work location, compensation, or benefits. Doc. 335, Ex. G at 3. Kevin Jakubenas, a white TSM, was also temporarily assigned to help work on the NMSBAP but was not asked to permanently be the lead agent because he was already assigned as an "industrial fellow" for Proctor and Gamble. *See* Doc. 353, Ex. 90 at 4; Doc. 333, Ex. C at 2.

25. In October 2006, Longmire was told that she would be assigned to work as an "agent" for the NMSBAP full time beginning in January 2007 and that, if her business development and licensing training was going to interfere with that job, the training project with Mott would be "taken away." Doc. 333, Ex. 1 at 8. Instead of accepting that permanent assignment, Longmire resigned

in January 2007.

26.   Dr. Beugelsdijk, with whom Longmire compares herself for purposes of the EPA claim, is a TSM with a PH.D. degree in a science and engineering field as well as an MBA.  Although he and Longmire performed some of the same types of tasks in the IBD division, he "performs work that requires a more technical understanding of science and technology than the work performed by [Longmire]."  Doc. 333, Ex. D at 3.  He "has a specific and detailed understanding of biotechnology and bioscience, pharmaceutical development, robotics and automation of laboratory analysis."  *Id.* "Dr. Beugelsdijk independently assesses technical statements of work and deliverables, prepares statements of work and drafts descriptions of technologies with minimal assistance from other TSMs.  Dr. Beugelsdijk assesses technology maturity using independent judgment with minimal interaction with the inventor."  *Id.* Dr. Beugelsdijk was also later assigned to work for the Center for Homeland Security; Longmire was not and she does not argue that she was ever qualified to be assigned to such a job.

27.   Longmire "does not perform [BDE] functions with the independence exercised by Dr. Beugelsdijk[, who] can be assigned more technically complex cases."  *Id.* Dr. Beugelsdijk was also an official team leader and therefore had "more or different job responsibilities" than Longmire. Doc. 333, Ex. B at 11.

28.   Dr. Randy Tremper was also a TSM with whom Longmire compares herself for purposes of the EPA claim.  "Dr. Tremper performs work that requires a more technical understanding of science and technology than the work performed by [Longmire] . . . . Dr. Tremper has a Ph.D. in material science and 30 years of experience in technology and manufacturing management.  He has a specific and detailed understanding of material science and manufacturing. Dr. Tremper [worked] on a Technology Management Team.  Dr. Tremper was assigned to the

Superconductivity Technology Center ["STC"], where he wrote the technical terms for research contracts and independently wrote technical descriptions of STC research and innovations. [Longmire] had no similar assignments.  Dr. Tremper [was] also assigned to manage the Laboratory's Technology Maturation Program.  Dr. Tremper independently assesse[d] technical statements of work and deliverables, prepare[d] statements of work and draft[ed] descriptions of technologies with minimal assistance from other TSMs.  Dr. Tremper assess[ed] technology maturity using independent judgment with minimal interaction with the inventor.  [Longmire] did not perform these functions with the independence exercised by Dr. Tremper.  Dr. Tremper can be assigned more technically complex cases.  Dr. Tremper [was] a Group-level manager at the Laboratory but [Longmire was] not.  Given that Dr. Tremper has functioned as a TSM in TT Division for a much longer period of time than [Longmire] has been employed in her position, his overall contribution to that Division's effort has been greater and has been reflected in a higher salary." Doc. 333, Ex. D at 4-5.  Dr. Tremper was also an official  team leader and therefore had more and/or different job responsibilities than Longmire.

29. Mike Connolly was another TSM with whom Longmire compares herself for purposes of the EPA claim.  "Mr. Connolly performed work that required a higher and more detailed understanding of entrepreneurship, science, and technology.  Mr. Connolly has an engineering degree from the US Navel Academy, a master's degree in Mechanical Engineering . . .  and an MBA . . . .  Connolly has extensive and direct experience as an entrepreneur and with the venture investment community [and] had been a principal in the formation of seven different bioscience firms.  Using that experience, Mr. Connolly was assigned to design and implement a new program for technology commercialization.  With that assignment, he founded the Laboratory's Technology Maturation Program, a widely acclaimed and successful program at the Laboratory. . . .  Connolly

14

independently assessed technical statements of work and deliverables, prepared statements of work and drafted descriptions of technologies with less assistance from other TSMs [and] assessed technology maturity using independent judgment with less interaction with the inventor. [] Longmire did not perform these functions with the independence exercised by Mr. Connolly.  Nor was [Longmire] ever assigned to develop her own technology commercialization program. [She] was given work assignments consistent with her non-technical education and work experience, such as literature searches and general business consulting." Doc. 333, Ex. D at 4-5; Ex. E at 4-5.

30.  While there was at least one other African-American employee in the IBD/TTD division, Longmire was the only African-American BDE.

31.  Doruk Aytulu, who is white, was "hired into a new TSM position" in July 2005 after having formerly been classified as a SSM-3 BDE.  Doc. 353, Ex. 84 at 1. In the new job, Aytulu was supposed to "better commercialize life science and telecommunication technologies" and to "take on a new and significant technical evaluation role as he will be screening patented technologies that may have applicability for licensing to New Mexico small businesses." *Id.*  Accordingly, Aytulu was reclassified as a TSM-level employee. *See id.*

**Discussion**

## I.  The Defendants are entitled to summary judgment on Longmire's EPA claims.

The EPA provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex:

> Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).  Thus,

> [t]o establish a *prima facie* case under the EPA, [plaintiff] has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances.  If a prima facie case is so established under the EPA the *defendant* must undertake the burden of *persuading* the jury that there existed reasons for the wage disparity which are described in the [EPA].  If the defendant fails in this respect, the plaintiff will prevail on her *prima facie* case.  Thus, under the EPA, the onus is on the employer to establish that the pay differential was premised on a factor other than sex.
>
> . . . .
>
> We do not construe the "equal work" requirement of the EPA broadly, and we have stated that failure to furnish equal pay for "comparable work" or "like jobs" is not actionable.  Rather, in order to prevail in such an EPA action, the jobs "must be 'substantially equal' in terms of 'skill,' 'effort,' 'responsibility,' and 'working conditions.'

*Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1364 (10th Cir. 1997) (internal quotation marks & citations omitted) (italics in original).  An EPA plaintiff who performs "some of the duties" of her comparators but does "not perform all of those duties" fails to make "a *prima facie* case that the jobs were substantially similar." *Miller v. Auto. Club of N. M., Inc*., 420 F.3d 1098, 1119 (10th Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006).  To summarize,

> [c]laims based upon the EPA [] do not follow the [] *McDonnell Douglas* burden-shifting framework.  Rather, EPA claims proceed in two steps.  First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work.  Having met this, the burden of *persuasion* then shifts to the defendant to prove that the wage disparity was justified by one of four permissible reasons.

16

These reasons are:  (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex.

*Mickelson v. N. Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006) (internal quotation marks and citations omitted) (italics in original).

As in the *Sprague* and *Miller* cases, Longmire has failed to establish a prima facie case for violation of the EPA.  Longmire contends that her work was "substantially similar" to her three male comparators, even though the three comparators were all hired into jobs requiring technical degrees, while she was not, because they all held the *unofficial job title* of BDE and all worked with transferring LANL technology to commercial uses.  She has not shown, however, that she performed equal work in a job requiring equal skill, effort, and responsibility under similar working conditions, and has failed to produce evidence that her actual job functions were substantially similar to those of Dr. Beugelsdijk, Dr. Tremper, and Mr. Connolly, the three male IBD/TTD executives with technical and scientific degrees who were also team and project leaders and who performed many job functions that she either was not qualified to perform or to which she was not assigned.

For example, although Longmire focuses on Connolly's job in her response brief, she admits that her individual performance objectives did not include the same objectives as Connolly's, like "innovatively" launching, founding, and managing the Technology Maturation Fund and Project, because she did not have a technical degree.  A comparison of her performance review with Connolly's also demonstrates that she did not perform many other jobs and functions requiring management and innovative or specialized-technical-expertise skills that Connolly performed, like (1) "launching and staffing" the Intellectual Property Coordinator initiative and assisting them in understanding the tech scouting and commercialization process and resources; (2) developing working relationships with New Mexico state investment councils; (3) engaging in extensive and

17

proactive relationships with national and New Mexico investors, including hosting visits from investors and firms interested in LANL investment opportunities; (4) leading the effort to establish new invention review teams; (5) mentoring junior TCEs, MBA contractors, and IPs; (6) developing a new email summary and matrix to feature LANL technology for distribution to potential licensees and investors; (7) reviewing 140 inventor disclosures; and (8) leading the IBD's efforts to define a potential Los Alamos Institute initiative. *See* Doc. 349 at 7; Doc. 351, Ex. 93; *compare* Doc. 351 Ex. 99 with *id.*, Ex. 100.

A comparison of Longmire's 2004-2005 performance appraisal with Dr. Tremper's similarly shows that Longmire's job responsibilities and skills and accomplishments were much different than his. Dr. Tremper spent most of his time contributing to the success of his *team* by providing "leadership, project management [] [and] mentoring" to the TMT-3 team, serving as an "executive committee member and proposal reviewer for the IUCRP/Discovery grant program," and "negotiat[ing] two license agreements." Doc. 351, Ex. 102. Longmire, on the other hand, continued to work with a "small number of her internal clients;" and "prodded" and "assisted" one client in preparing a successful proposal and gave him business start-up advice. *Id.*, Ex. 103.

The uncontroverted evidence is that (i) Longmire was not hired to do the same job or to perform the same common core of tasks as the three EPA comparators with advanced technical degrees and skills, nor did she do substantially the same work as they did; (ii) she did not have the same advanced educational background in science and technology as her comparators; (iii) she was not an actual project or team leader in the IBD/TTD like her comparators and therefore did not perform "equal work"; (iv) she at times worked only part time and in different divisions of LANL than her comparators; (v) she did not have the same skill sets or national reputations and experience as her comparators and performed work that was not substantially equal to their work; and (vi) she

18

had not independently developed programs benefitting LANL, nor was she able to independently perform her job as a BDE in the same manner as her comparators, which made her job not substantially equal to theirs.  At most, she performed only some functions of the jobs her comparators performed, and to a much lesser extent.

Longmire states that, in February 2008, LANL advertised a job that combines BDE functions with licensing functions and does not require a technical degree.  *See* Doc. 349 at 14.  That fact though has no relevance to the issue whether Longmire made a prima facie showing that she was performing substantially the same work as male employees but was being paid less between 2001 and 2007.  Therefore, summary judgment is granted in favor of Defendants and Longmire's claims for alleged violation of the EPA against all Defendants is dismissed.

## II.    The Defendants are entitled to summary judgment on Longmire's claims for discrimination based on the ADEA.

Charges of unlawful discrimination under the ADEA and Title VII are analyzed the same way.  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) ("In cases brought under Title VII and the ADEA where circumstantial evidence is the basis for the claim, our analysis at the summary judgment stage is governed by the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."); *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215 (10th Cir. 2006).

The ADEA makes it 'unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Longmire is protected under the ADEA because she was at least forty years old at the time LANL agents committed allegedly discriminatory acts based on her age.  *See* 29 U.S.C. §

19

631(a). Title VII similarly makes it unlawful for employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To succeed on her claims at the summary-judgment stage, Longmire must present sufficient evidence from which a jury could infer both an adverse employment decision and that race or age "was a determinative factor in the defendant's employment decision or show that the defendant's explanation for its actions was merely pretext." *Garrett*, 305 F.3d at 1216; *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008) (stating that a plaintiff must show in an ADEA case that the defendant's adverse employment actions were "motivated, at least in part, by age"). As mentioned above, where, as here, an ADEA or Title VII plaintiff relies solely on circumstantial evidence to establish age discrimination, I apply the *McDonnell Douglas* three-step burden-shifting framework for determining whether Longmire's summary-judgment evidence raises a sufficient inference of invidious discriminatory intent to go to trial. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

> This three-step analysis first requires the plaintiff to prove a prima facie case of discrimination. If plaintiff establishes a prima facie case, the burden of going forward shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions. If the defendant does so, the plaintiff must either show that his race, age, gender, or other illegal consideration was a determinative factor in the defendant's employment decision, or show that the defendant's explanation for its action was merely pretext.

*Id.* (citations and internal quotation marks omitted). "In the absence of facts tending to establish this initial inference, plaintiff is not entitled to the presumption of discrimination and a defendant is not required to defend against the charge." *Id.* at 1146. "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Kendrick v. Penske*

20

*Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (internal quotation marks omitted).  To

do so, the plaintiff must demonstrate "a logical connection between each element of the prima facie

case and the illegal discrimination for which it establishes a legally mandatory rebuttable

presumption." *Id.*

Longmire contends that LANL and/or its agents made the following discriminatory and

adverse employment decisions based either on her age or her race:  (i) they excluded her from being

able to apply for new TSM-level BDE positions by requiring a technical degree and hired TSMs

who were younger than forty or white, *see* Doc. 238 at 9, Doc. 286 at 6; (ii) they denied her the

opportunity to be reclassified as a TSM while people under the age of forty or white were allowed

to be TSMs, *see id.*; (iii) they selected Canuteson, a white TSM who was under forty, to be the team

leader of TMT-2 instead of her and moved her to the DO, *see* Doc. 239 at 9; Doc. 286 at 7; (iv) they

denied her training opportunities for learning licensing procedures but allowed newly-hired and

younger TSM-level BDEs to acquire that training, *see* Doc. 238 at 10; Doc. 286 at 7; (v) they

assigned her to the NMSBAP instead of allowing her to remain a BDE, thereby "dead ending" and

impairing her career, but allowed newly-hired and white TSM-level BDEs to continue in their jobs,

*see* Doc. 238 at 10; Doc. 286 at 7; and (vi) they paid her less than younger, white TSM-level BDEs,

*see* Doc. 238 at 11; Doc. 286 at 6.  In addition, she claims that the following were adverse actions

motivated by an intent to discriminate against her on the basis of race:  (vii) they "secretly" demoted

her, thereby preventing her from entering management, but did not do the same to white employees,

*see* Doc. 286 at 6-7; (viii) she received a lower ORC score in 2005 than in 2004 even though she had

won two distinguished performance awards in 2005, and the lowest ORC score that year was

received by the only other African American in TTD, *see* Doc. 286 at 7, Doc. 350 at 11; and (ix) she

and the other African American also received lower interim increases in salary than white SSMs in

21

the fall of 2005, *see* Doc. 350 at 11-12.  I will first address Longmire's contentions that were based on alleged age and race discrimination and will address her contentions based solely on alleged race discrimination in the next section.

When asked in February 2007 if she had "any evidence or proof" that supported her contention that these actions were based on her age, Longmire replied, "not yet."  Doc. 356, Att. 1 at 3.  Thus, in their summary judgment motion, the Defendants contend that Longmire cannot present any evidence from which a jury could infer that the Defendants discriminated against her because of her age and that the record shows their decisions and her lower salary in certain cases were based on the fact that she did not have the same technical degrees as the TSMs with whom she compares herself.  Defendants are correct.  Additionally, the Court must also address Longmire's arguments that her summary-judgment response evidence regarding other comparators gives rise to an inference of age discrimination.  While the Defendants argue that I should disregard her evidence on their contention that Longmire identified only Dr. Beugelsdijk, Dr. Tremper, and Mr. Connolly as comparators and the new attempt to name new comparators is a sham, I conclude that she identified the three males as her comparators in response to a specific question regarding her EPA claims, *see* Doc. 333, Ex. B at 10, and is not foreclosed from naming other comparators for her age/race claims.

Longmire, who was a 45-year-old SSM-3 on October 1, 2001, first compares herself for purposes of her ADEA claim with Belinda Padilla, who on that date was a 37-year-old hispanic female SSM-3.  *See* Doc. 348 at 7.  Before their raises, Longmire and Padilla each earned $68,000, but on October 1 Padilla was given a 6.029% "merit increase" and Longmire was given a 4.706% "merit increase," resulting in Padilla's salary becoming $900 more than Longmire's.  *See* Doc. 354, Ex. 34 at 1-2.  Longmire supplies no information about the job that Padilla was doing at the time and

22

the evidence indicates the raise was based on merit/job content rather than age because Padilla's total ORC score was 8.5, in comparison with Longmire's total ORC score of 6.5.  *See id.*; Doc. 348 at 7; Doc. 354, Ex. 22.  Further, according to Longmire, Padilla did not do the same business-development job that she did.  *See* Doc. 353, Ex. 90 at 3 ("I remained the one and only SSM-level BDE throughout my employment . . . .").  Simply sharing "the same pay grade does not establish, standing alone, that the employees occupy 'similar positions'" for purposes of the ADEA.  *Hinds*, 523 F.3d at 1196.  Simply stated, Longmire has not provided sufficient evidence that she was paid less than a similarly-situated employee because of her age.

Longmire also contends that Padilla was "being moved into management relatively quickly" in 2002 at the age of 38, when she was promoted to Team Leader at a salary of $82,000, while Longmire earned $74,500 and was not promoted.  Doc. 348 at 7.  It is undisputed, however, that not only did Padilla and Longmire not occupy similar jobs, but Longmire was working only part-time at her request during this time period.  She can not reasonably compare herself to a full-time employee performing a different job for the purposes of establishing a prima facie case of age discrimination.  *See Hinds*, 523 F.3d at 1196 (holding that, "at a minimum, a plaintiff must establish that a purportedly 'similar position' is one that he or she was qualified to assume" and that she does a "substantively comparable job[]" as her comparator).

Further, the record reflects that Padilla continued to earn merit increases and promotions after she turned forty, which  indicates that LANL and/or its agents were not improperly motivated by age in making their employment decisions.  *See* Doc. 354, Ex. 34 at 2.  As a matter of law, I find that a jury could a jury could not reasonably infer discrimination motivated by age based on Longmire's evidence concerning Padilla.

Longmire's comparisons to younger, white TSM-level BDEs who had both technical degrees

23

and MBA degrees as evidence of discriminatory age or race animus fails for a similar reason – their positions were not "substantively comparable." Simply put, Longmire was not qualified to occupy a TSM-level position and she has presented no evidence that she performed tasks requiring technical skills.

LANL and the present day City of Los Alamos came into existence during World War II as a result of the United States Government's successful plan to be the first country to develop the atomic bomb. LANL has played and continues to play a historic and vital role in the development and maintenance of the United States' nuclear weapons program. Requiring a technical degree or demonstrated technical skills to occupy the TSM pay level and deciding to staff a scientific technology transfer division in a national research laboratory with employees with scientific degrees and to offer them different opportunities is neither unlawful nor discriminatory as a matter of law and in fact, such practice makes a lot of common sense[1]. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 938 (10th Cir. 2005) (adopting the view that "[e]mployers, not employees or courts, are entitled to define the core qualifications for a position, so long as the criteria utilized by the company are of a nondiscriminatory nature") (internal quotation marks & citation omitted).

Even if Longmire showed that she was qualified to occupy the TSM-level positions her younger, white comparators occupied, the record shows that Longmire was paid more at some points than some of the younger, white TSM-level BDEs. For example, at the time she was transferred to

---

[1] In her deposition, Longmire described LANL's pay categories as a "caste system" and contended that excluding someone from an employment position or pay level on the basis of their lack of a particular educational degree is unlawful discrimination and "the same as excluding someone because of their ethnicity, race, gender, anything. It's the same concept." Doc. 333, Ex. B at 9-10. But she is wrong. No statute forbids distinguishing between employees on the basis of academic or educational requirements and while a person cannot change her ethnicity, race, age, or gender, she can change her educational and degree status.

24

TTD in 2004, Erica Sullivan earned $5000 more than Longmire, but because Longmire was given a larger raise in November 2005, Longmire was paid more than Sullivan at that point even though Sullivan was a younger, white TSM-level BDE and Longmire was an SSM-level BDE.  *See* Doc. 353 at 18 (showing Longmire earning $89,614 after her November 2005 raise and Sullivan earning $87,743 after her raise).  On October 2, 2006, Sullivan earned $89,543, while Longmire earned $90,714.  *See* Doc. 354, Ex. 22 at 1-2.  Similarly, Doruk Aytulu, a younger, white TSM-level BDE employee who worked with Longmire in the Development Office in October 2006, and with whom Longmire compares herself for purposes of the ADEA and claims of race discrimination, earned $90,122 in 2006 while Longmire earned $90,714.  *See id.* at 2.

Longmire contends that the fact that she was not hired for TSM positions (for which she did not apply because she was not qualified) and that she was not allowed to be reclassified as a TSM (although she never followed through with applying for such reclassification[2]) are evidence of discriminatory intent.  While  "[e]mployment discrimination law does not require that a plaintiff formally apply for the job in question . . . the law requires . . . where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job."  *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1251 (10th Cir. 1992).  Because she was not qualified for the TSM-level positions and she did not perform any technical or scientific functions that would have qualified her to apply for reclassification as a TSM without a technical degree, as a matter of law Longmire cannot reasonably be considered as having a valid interest in the TSM-level positions that would make LANL's failure to promote or reclassify her to a TSM an adverse

---

[2]  Longmire contends that "the process to obtain [a technical degree] appeared onerous," so she decided she "would not undertake the process."  Doc. 348 at 17.  It appears that Longmire erroneously believes that she is entitled to the same pay that other employees received who *did* undertake such an "onerous process."

employment action.

Nor does Longmire's assignment to the NMSBAP constitute an adverse employment action. In determining whether an employment action was adverse, I "take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Haynes*, 456 F.3d at 1222 (internal quotation marks omitted). "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *Id.* (internal quotation marks omitted). Here, Longmire was not demoted in location, pay, responsibilities, or benefits, but rather was assigned different responsibilities in an important, necessary, and high-profile area dealing with entrepreneurs, scientists, businesses, and technology projects[3]. As Longmire points out, by 2006 she was the only non-TSM level BDE in the TTD. She had the MBA degree, qualifications, and experience to perform well in her new position with the NMSBAP and had performed well in 2003 in assisting LANL with institutional business planning. *See* Doc. 352, Ex. 73. She initially *volunteered* to work in that position, *see* Doc. 353, Ex. 74 at 1, and she has not rebutted the Defendants' evidence that to place anyone else in that job at that time would have left a hole in their other divisions and that budget constraints precluded hiring another employee for that position. Placement in the position with the NMSBAP was not an adverse

---

[3] Although Longmire contends that her job duties with the NMSBAP were "completely different than a BDE's," Doc. 348 at 15-16, the TSM-level Business Development/Licensing Executive job description she uses as the BDE comparison is not a job that she held or was ever qualified to hold and is not a valid comparator. *See* Doc. 352, Ex. 53. The record shows that Longmire used her MBA degree and skills and experience both as a BDE and as the LANL agent for the NMSBAP; she worked in both positions with entrepreneurs and scientists to develop projects linked to technologies developed at LANL, she worked in both positions advising on general business planning, and she worked in both positions as a liason for LANL with the business community.

employment action as a matter of law. *See Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) ("If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.") (internal quotation marks omitted).

Because Longmire has not made a prima facie showing that the acts she complains of were adverse or that any allegedly adverse actions were motivated at least in part by an improper discriminatory animus, all Defendants are entitled to summary judgment on Longmire's ADEA claims and on the similar claims for race discrimination.

## III. Defendants are entitled to summary judgment on Longmire's remaining Title VII claims based on race because they are untimely.

In their summary-judgment motion regarding her remaining Title VII discrimination claims based on race, the Defendants contend that, assuming that secretly demoting her; not promoting her to a Team Leader position in the IBD; giving her a salary increase in 2005 that was lower than that given to another SSM-3 level white employee; and giving her a lower ORC score in 2005 than in 2004 could be perceived as adverse employment actions, the reasons they gave for the actions are lawful and there is no evidence of pretext. In their reply brief, they additionally contend (as they did in their answer to the amended complaint as an affirmative defense) that Longmire failed to timely file EEOC claims regarding allegedly discriminatory acts occurring before April, 2006, which bars all of those claims. Longmire did not request an opportunity to address this defense, and because it is based only on evidence already in the summary-judgment record and is easily resolved on that record of undisputed facts, I have considered it. *See Beaird v. Seagate Techn., Inc.*, 145 F.3d 1159, 1164-65 (10th Cir. 1998) (noting that "determining whether the district court may

27

consider evidence and issues raised by the party moving for summary judgment in a reply brief without allowing the opposing party to respond, fits best within th[e] 'supervision of litigation' framework" that is reviewed for abuse of discretion and that "Rule 56(c) simply requires that if the court relies on new materials or arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials").

Longmire filed her charge of racial discrimination with the EEOC on January 31, 2007. In it, she complained of three undated discriminatory actions based on her race since February 2001: she "was not promoted," she "was demoted," and she "made considerably less than [her] coworkers who are non-Black." No. CIV-05-1082, Doc. 53, Ex. 1. "Title VII requires each discrete act of discrimination (such as termination, failure to promote, denial of transfer, or refusal to hire) to be described in, and to be the subject of, a timely filed charge. That is, a plaintiff can bring a lawsuit for only those 'unlawful employment practices' described in his or her administrative charge." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1166 (10th Cir. 2007) (citations omitted). Further, only those adverse employment actions that occurred within 300 days prior to the filing of Longmire's EEOC charge are actionable. *See* 42 U.S.C. § 2000e-5(e)(1); *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1156 (10th Cir. 2008) ("In the context of suits based on discrete acts, a court may easily determine whether the plaintiff filed a claim within the limitations period."). Thus, Longmire's claims premised on events that occurred before April 2006 or for which she has not filed a claim are untimely and must be dismissed in summary judgment.

The allegedly "secret demotions" Longmire complains of occurred in 2001 and 2002. The evidence conclusively shows that Longmire knew her official job title of Team Leader was changed in 2001 when she moved to the IBD. Longmire claims that she did not discover her 2002 job-title change when she went to part-time work until 2003. Because the job-title changes had no practical

negative effect on Longmire's actual responsibilities, they were not demotions, and I find they are not adverse employment actions as a matter of law. Even if they could be considered adverse actions, Longmire's claims based on those events are time barred because she failed to file an EEOC charge within 300 days of learning that her official job titles had been changed.

For this same reason, her claims based on LANL's failure to promote her as the team leader in 2004 instead of Canuteson and on her claim that they gave her a significant salary increase in 2005 that was lower than that of some white employees are time-barred. Longmire did not allege in her EEOC charge that giving her a lower ORC score in 2005 was a discriminatory act and her claim for racial discrimination based on that event is barred for that reason.

In short, all of the allegedly discriminatory acts based on race that Longmire complains of, except for her May 2006 assignment to the NMSBAP (which is not an adverse employment decision), occurred before April 2006 and are time-barred. Additionally, because Longmire did not file a charge of racial discrimination based upon her May 2006 part-time assignment to the NMSBAP or on her involuntary, full-time assignment to that project in September or October 2006, the Defendants are also entitled to summary judgment on these claims.

Even if I did not consider the limitations defense, the Defendants still are entitled to summary judgment on all remaining claims for racial discrimination. Longmire had received yearly salary increases since 1998 and she received another salary increase of 11.67%, to $89,614, in November 2005 (in comparison to her June 2005 salary) as part of LANL's effort to ensure that salaries more accurately reflected the kinds of work employees were performing. *See* Doc. 353, Ex. 75; Doc. 352, Ex. 65 at 2-3. Longmire contends that this increase is proof of racial discrimination because it was not as high as Laura Barber's, a white female SSM-3 who was a licensing executive in the TTD. *See* Doc. 333, Ex. B at 8; Doc. 354, Ex. 9; Doc. 353, Ex. 75. Again, Longmire's

comparison fails because Barber did not occupy the same or a similar job as Longmire.

Although Longmire contends that her salary increase was the lowest among the SSM-3s, and her salary was the lowest among SSM-3s in 2005, which she contends gives rise to an inference of racial discrimination, the record belies those claims. Doruk Aytulu, a white BDE who was still an SSM-3 at that time, had a lower salary than Longmire after the increase; Elmer Salazar, an Hispanic SSM-3 and Dave Swavely, a white SSM-3 both were given lower percentage salary increases than Longmire, and Erica Sullivan, a white TSM-level BDE was given both a lower percentage increase and a lower salary than Longmire in 2005. *See* Doc. 353, Ex. 75. In addition, Brad Morie and Marc Oettinger, white TSMs who were BDEs and with whom Longmire compares herself also were given lower percentage salary increases than Longmire, and Morie's final salary was just under $400 more than Longmire's, which is an insignificant amount. *See id.* On this record, no jury could reasonably find that Longmire's increase in salary or her salary itself is evidence of racial discriminatory animus.

The same is true for the ORC scores. The record shows that the difference in Longmire's ORC scores between 2004 and 2005 did not arise from her performance scores, but rather from the job-content score as it benefitted LANL. *See* Doc. 354, Ex. 22 (showing ORC performance scores of 3.0 for both years but a job-content score of 3.5 for 2004 and 2.5 for 2005). Thus, Longmire's reasoning that it did not make sense to give her a lower score in 2005 than in 2004 when the teams she was on had won two performance awards in 2005 but not in 2004 does not itself seem relevant because those awards related to performance, not to job content. Further, Brad Morie, a white male TSM-level BDE with whom Longmire has compared herself, received the same ORC scores in both performance and job content as Longmire in 2005 and those scores both were also lower than his 2004 scores, indicating that decisions to lower ORC scores were made for nondiscriminatory

30

reasons. *See id.*  In short, Longmire presents no evidence from which a jury could reasonably infer that the reason she was given a lower job-content score in 2005 was motivated by unlawful racial animus.

## IV.  Defendants are entitled to summary judgment on Longmire's claims for breach of contract.

Longmire's breach of contract claims are all premised on her contention that the Defendants discriminated against her or violated the EPA, thereby violating LANL policies that she relied upon and that she argues formed an employment contract.  Because Longmire has not made a prima facie showing of discrimination of any kind, Defendants are entitled to summary judgment and her breach of contract claims must likewise be dismissed.

### Conclusion

Longmire has failed to meet her burden of showing a disputed issue of material fact with regard to violation of the EPA, discrimination on the basis of age or race, and breach of contract. Accordingly, the Defendants' three motions for summary judgment shall be granted and all claims are resolved in favor of the Defendants, including LANL and the DOE.

**IT IS THEREFORE ORDERED** that the Defendants' Motions for Summary Judgment (Docs. 332, 334, and 336) are hereby GRANTED for the reasons set forth in this Memorandum Opinion and Order and this case is hereby DISMISSED WITH PREJUDICE.

_____
UNITED STATES DISTRICT JUDGE